CHARRON, Respondent, vs. NORTHWESTERN FUEL COMPANY,
Appellant.

*February 20—April 23, 1912.*

*Master and/servant: Injury: Negligence: Fellow-servants: Leaving
employment: Stopping to rest: Contributory negligence: Settle-
ment: Release of claim: Rescission: Mental incompetency: Vol-
untary payment to wife of injured person.*

1. Members of a carpenter's repair gang engaged in making repairs
   and changes on the premises of the master, in the discharge of
   the latter's duty to provide a safe place to work, are not fel-
   low-servants with ordinary employees who are simply employed
   to carry on the employer's business.
2. If a servant voluntarily and unnecessarily leaves his employment
   and assumes a position of peril merely for his own pleasure or
   convenience he ceases to be an employee for the time being and
   becomes either a trespasser or at best a mere licensee.
3. But a workman employed in hard physical labor who, while stop-
   ping for a moment's respite of the ordinary and usual nature,
   steps a few feet from his line of travel, is not thereby divested
   of his character as an employee.
4. Plaintiff, a member of a gang of carpenters who were repairing
   defendant's coal dock, was required, in the performance of his
   duties, to cross a platform underneath a rig upon which a sus-
   pended clam-shell bucket was operated. His line of travel
   crossed the path of the bucket at right angles. In one of his
   trips across this platform he stopped a minute or two to rest
   and had stepped to the edge of the platform, about eight feet
   from his line of travel, and was looking down upon a vessel at
   the dock, when the bucket, which had been started without
   warning, swept him off the platform, injuring him severely.
   *Held*, that the jury were justified in finding that defendant's
   failure to give warning before starting the bucket constituted
   a want of ordinary care, and that plaintiff was not guilty of con-
   tributory negligence in stopping upon the platform as he did.
5. One who has received money or property in settlement of a dis-
   puted claim and given a release cannot maintain an action at
   law on the claim without rescinding the contract of settlement
   for some legal cause and returning or offering to return the
   consideration received.

6. Where, at a time when an injured employee was incompetent to act, the employer secured a release signed by the employee's wife and by the employee himself with a mark, and turned over to the wife a check in settlement of the claim for the injury, and the wife used the proceeds of the check without her husband's knowledge or consent, the transaction constituted a voluntary payment to the wife without the husband's knowledge, rather than a settlement and release of the claim; and the rule above stated as to rescission is inapplicable.

APPEAL from a judgment of the circuit court for Douglas county: E. W. HELMS, Judge. *Affirmed.*

Action for personal injuries suffered by plaintiff while at work upon defendant's coal dock at Washburn, Wisconsin, May 27, 1907. He was a common laborer engaged in helping a gang of carpenters in making extensive repairs upon the dock at the time of the injury. The dock is used for unloading coal from lake vessels. Along the face of the dock and near the edge are a considerable number of frame structures, called unloading rigs, and by means of them clam shells or buckets, suspended from a carriage, are run out over the boats on a horizontal boom, lowered down into the hold of the vessel, and then raised to the boom and run back through the framework of the unloading rig and emptied in the yard at the proper place on the shore side of the rig. The clam is then brought forward, suspended from its carriage which · runs upon the boom, and the operation repeated. Each clam is operated by a hoister, who is stationed in a hoisting shanty placed on the superstructure of the rig, and· he, by means of levers, runs the clam backwards and forwards, and raises, lowers, and dumps it. The unloading rigs are side by side, and really form one long continuous open framework nearly or quite forty feet high over all, but each clam shell and boom is operated by itself and by one hoister. The hoister's shanty is about twenty feet above the dock, and has windows towards the water and towards the side and rear of the dock. When the clam shell is at rest and not in use it hangs suspended

from its carriage at about the level of the floor of the shanty and some sixteen feet back from the harbor face of the rig. When the hoister brings it into operation it moves rapidly forward, practically in a horizontal line, through an open space in the rig structure and at a distance of a few feet from the hoister's shanty, and passes out from the harbor face of the rig far enough so that it can be lowered into one of the hatchways of a vessel lying at the dock.   In passing through the rig structure it passes three or four feet above a platform or covered space some twelve feet or more square.   This space is from time to time used as a passageway by the defendant's employees as they find it necessary to pass from one rig to another.

On the morning of the accident the plaintiff was directed to carry some planks to the carpenter gang, which was making repairs on the upper part of rig No. 3.   The rig on which the accident happened was rig No. 4 and was located between Nos. 3 and 5, all being really a part of the same general structure.   The plaintiff took a plank and went up an open stairway between rigs Nos. 5 and 4 and reached the platform or landing above referred to on rig No. 4.   Crossing this platform near the rear part thereof and passing near the hoister's shanty, he reached another ladder at the rear of rig No. 4, which he climbed and thus reached the upper part of the structure on rig No. 3.   Here he put down his plank and returned by the same route to get another plank.   He passed the hoister's shanty on rig No. 4 on his return trip and reached the platform safely.   The hoister saw him pass his door just before reaching the platform.   When he reached the platform he testifies that he started to walk straight across it (practically at right angles with the path of the clam shell when in operation), and that the clam shell was started at that moment by the hoister and swept across the platform, knocking him down and carrying him over the edge, where he fell to the vessel below and received very serious injuries. Here the plaintiff is contradicted by several witnesses, who

testified to the effect that when he reached the platform he advanced about eight feet to the edge thereof, facing the harbor, and stood there for a short space of time, with his hand against the hoister's shanty, looking down at the vessel below, and that the clam shell struck him while in that position. The hoister testified that it was two or three minutes after the plaintiff passed the shanty before he started the clam shell. It is undisputed that the clam shell was started without warning and that this was the first trip which it had made that morning, also that the plaintiff's duty did not call him to the edge of the platform.

Some weeks after the accident a settlement was made with the plaintiff, and the sum of $280 paid and a release signed by him. The plaintiff claimed, however, that he was mentally incompetent to make any settlement; that he received no money himself, but that the money was received by his wife and spent without his knowledge or authority; that he was insolvent and unable to return the money, but desired that it might be credited on any verdict which he might obtain. The jury returned the following special verdict:

"(1) Was the plaintiff, at the time he was struck by the clam, walking across platform 4 from stairway to stairway? A. No.

"(2) Was the plaintiff, at the time he was struck by the clam, standing near the edge of platform 4 facing toward the water? A. Yes.

"(3) Was the defendant guilty of want of ordinary care on the morning in question in starting the clam without giving any warning or signal to carpenters or their helpers, who might be crossing platform 4 in connection with their work? A. Yes.

"(4) If you answer 'Yes' to question 3, then answer this: Was the want of ordinary care found by your answer to question 3 the proximate cause of plaintiff's injury? A. Yes.

"(5) Did the plaintiff fail to exercise ordinary care for his own safety, which contributed proximately to his injury? A. No.

"(6) Did the plaintiff, at the time he came from above to

platform 4, immediately before his accident, know that the work was about to start on rig number 4? *A.* No.

"(7) Would a person of ordinary intelligence and prudence under the circumstances surrounding plaintiff when he arrived at platform 4, and possessed at that time of the same knowledge and experience of the previous operations upon said dock that plaintiff possessed, in the exercise of ordinary care, have understood that work was about to start upon rig 4? *A.* No.

"(8) If you answer question number 2 'Yes,' then answer this: Would plaintiff have been struck by the clam and injured had he not been standing at the edge of the platform facing the water? *A.* Yes.

"(9) Did the starting of the clam in motion from a stationary position on the runway make sufficient noise to be heard by persons within or near the line of the clam's travel for a distance of fifty feet or more? *A.* Yes.

"(10) Was the plaintiff on July 9, 1907, mentally competent to make settlement? *A.* No.

"(11) If you answer question number 10 'No,' then answer this: Did the plaintiff, before commencing this action, on the 15th of September, 1908, know of and understand that he had received $280 upon a settlement? *A.* Yes.

"(12) What sum of money will fairly compensate plaintiff for the injuries he received at the time of the accident? *A.* $5,000."

The trial court made a special finding of fact to the effect that the defendant acted in good faith in making the alleged settlement, and without knowledge of the plaintiff's incompetency.

The defendant moved to change the answers to questions 4, 5, and 8 of the verdict, and also moved for judgment on the verdict, which motions were overruled and judgment rendered for the plaintiff for $4,720, from which judgment the defendant appeals.

For the appellant there was a brief by *Luse, Powell & Luse,* attorneys, and *Abbott, Merrill & Lewis,* of counsel, and oral argument by *H. T. Abbott* and *L. K. Luse.*

*Victor Linley,* for the respondent.

The following opinion was filed March 12, 1912:

WINSLOW, C. J.   The material contentions of the defendant are three in number, viz.: (1) that the hoister was a fellow-servant; (2) that the plaintiff was entirely outside of the line of his duty when he was injured; and (3) that he cannot recover in any event, because he has not returned or offered to return the amount received by him in settlement of his claim.

1. The first contention must fail.   The evidence clearly shows that the plaintiff was a member of a carpenter's repair gang which was making extensive repairs and changes in the structure.   Such workmen are discharging the duty of the master to provide a safe place to work, and are not fellow-servants with ordinary employees who are simply employed to carry on the employer's business in the structure.   *Sparling v. United States S. Co.* 136 Wis. 509, 117 N. W. 1055, and cases there cited.

2. Whether at the time of the accident he had so far departed from his duty that the relation of master and servant did not exist for the time being is a more difficult question. It is established that no duty called him to the precise place where he was struck, and that he was in fact standing at the edge of the platform, some eight feet from his line of travel, gazing down at the operations on the vessel below, when the clam shell struck him.   How long he had stood there is not determined by the jury, but the most of the witnesses who testified to seeing him there state that he stood there a minute or two; three minutes seems to be the longest time allowed by any witness; but they are all estimates, and we are all cognizant of the utter unreliability of any estimate of elapsed time under such circumstances.   Probably the most that can be said is that it was somewhere between one minute and three minutes.   Of course, the principle is well established that if a servant voluntarily and unnecessarily leaves his employment and assumes a position of peril merely for

his own pleasure or convenience he ceases to be an employee for the time being and becomes either a trespasser or at best a mere licensee. 26 Cyc. p. 1224, sec. 9; 2 Labatt, Mast. & Serv. p. 1851, sec. 629; *Goff v. C. R. & M. R. Co.* 86 Wis. 237, 56 N. W. 465.

But the law aims to be reasonable. It recognizes that it has to deal with imperfect human beings and not with faultless and unerring automatons, and that its rules should be shaped accordingly. It must recognize the fact that men employed in hard physical labor require and habitually take some brief respite at times during the work as opportunity offers; and it must also recognize the fact that such a respite, if only of the ordinary and usual nature, cannot rightly be called a leaving of the employment. In the present case the plaintiff had just carried a plank, doubtless of considerable weight, to the top of the structure. In returning he stopped for a minute or two at a convenient stopping place, stepped perhaps eight feet from his line of travel, and gazed at the operations upon and about the vessel and the harbor below, which were doubtless interesting and attractive. We do not feel that we are obliged to hold or ought to hold as matter of law that this brief and very natural break in the plaintiff's routine labor divested him of his character as an employee. We have been referred to no authorities which bear a very close analogy to the present case, and we are content to rest the ruling upon general principles.

This question being disposed of, no good reason appears why the jury were not amply justified in finding that there was want of ordinary care on the part of the defendant in starting the clam without warning, and that the plaintiff was not guilty of contributory negligence.

3. Doubtless the rule is general that one who has received money or property in settlement of a disputed claim and given a release cannot maintain an action at law on the claim without rescinding the contract of settlement for some legal cause, and returning, or offering to return, the consideration

received.   This is simply an application of the general prin-
ciple that one who wishes to rescind a contract for fraud or
mistake must rescind *in toto,* except in cases where there may
be a severance of one part of the contract, in which event a
partial rescission is sometimes allowed in the interests of jus-
tice.   *Gay v. D. M. Osborne & Co.* 102 Wis. 641, 78 N. W.
1079.   It is clear that the present case is not one in which ·
there could be any severance.

The difficulty in the application of the rule to the present
case is that it cannot be said that the plaintiff ever knowingly
or in fact received any money or property.   The evidence
shows that at the time of the supposed settlement, after the
terms were agreed to, a check for $280 was put upon the table
by the defendant's agent, payable to plaintiff's order; that
plaintiff's wife signed the plaintiff's name to the release and
the plaintiff made his mark thereto, and the defendant's agent
left the room, leaving the check upon the table.   The verdict
of the jury establishes the fact that the plaintiff was incom-
petent at the time, and this finding is not seriously attacked.
The check was cashed at the bank by plaintiff's wife, who ap-
parently signed her husband's name on the back.   The plaint-
iff never received any money, and testifies that he never had
the check or any money therefrom in his possession, and never
knew that his wife had the check or the money, or that she
used it, until after the present action was commenced.   The
fact seems to be that his wife used the money for family ex-
penses during plaintiff's illness and incompetency without his
knowledge or authority.   It also appears that it has been ut-
terly impossible for the plaintiff to earn or obtain from any
source enough money to make a tender of repayment.

Now if it be a fact, as the jury found, that the plaintiff was
incompetent to act at the time the settlement was made and
that the check was in fact turned over to his wife and the
proceeds used by her without his knowledge or consent, it
seems to us that it can hardly be said that he received any
consideration for the release.   It is rather the case of a vol-

untary payment made to the wife without the husband's knowledge. A party must certainly have opportunity to say whether he will or will not receive money in settlement of a claim, and this opportunity, under the uncontradicted evidence, *Mr. Charron* never had.

Some objections of a trifling nature are made to certain minor rulings on testimony, but they are not deemed of sufficient importance to justify treatment.

*By the Court.*—Judgment affirmed.

VINJE, J., took no part.

A motion for a rehearing was denied April 23, 1912.