14196

SMITH v. HOME INS. CO.

(188 S. E., 166)

*Messrs. Lee & Moise* and *William P. Baskin, Jr.,* for appellant,

*Mr. Henry C. Jennings,* for respondent,

January 3, 1936.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

Appellant issued its policy insuring the motor truck of respondent against direct loss, or damage by fire, with proper deduction for depreciation; the limit of liability to be what it would cost to repair, or replace, the said truck, or parts thereof with other of like kind and quality. By the terms of the policy the respondent, Guy Preston Smith, as purchaser, and Universal Credit Company, mortgagee, were the assured. The policy specifically provided: "Loss, if any, to be adjusted with the purchaser assured, though to be paid, subject to all the conditions of this policy only to the Universal Credit Company for the account of all interests."

It also contained the usual provision with reference to an appraisal to be had on the written demand of either the assured or the insurer. This clause provided: "The appraisers shall then appraise the loss and damage stating separately sound value and loss, or damage; and failing to agree shall submit their differences only, to the umpire. An award in writing of any two, when filed with this company, shall determine the amount of sound value and loss, or damage."

The policy further provided that if an appraisal is demanded, then payment of the loss is not to be made "until sixty days after an award has been made by the appraisers."

The loss occurred on or about November 3, 1933. A. C. Phelps, an independent insurance adjuster employed by the appellant, endeavored to adjust the loss with respondent. Failing to reach an adjustment, an appraisal was demanded by letter dated March 10, 1934, and W. J. Shaw was nominated as appraiser on behalf of the company. By letter dated March 13, 1934, respondent nominated B. L. Inabinet as his appraiser. The parties then, on March 18, 1934, entered into a written agreement for the submission of the matter to appraisers. The appraisers qualified, and appointed G. W. Shaw as umpire, on March 30, 1934. The appraisal was

had on the same day. The sound value was fixed at $600.00, and the loss at $282.00, and this was signed by G. W. Shaw, umpire, and W. J. Shaw, appraiser. The appraiser appointed by the respondent refused to sign. On March 31, 1934, the adjuster notified the assured that the loss and damage had been fixed at $282.00.

On June 21, 1934, about eighty days after the date of the award, appellant issued its draft payable to the order of Universal Credit Company for $282.00, covering the amount of the loss and damage. This payment was made in accordance with the stipulations in the policy as hereinabove referred to. After crediting this amount, there remained a balance of $318.00 still due to Universal Credit Company. At no time, either before suit was brought, or after suit was brought, in the pleadings or otherwise, did respondent ever offer to return, or tender, the amount paid in settlement of the loss. Respondent admitted that he knew that any payment made in settlement of the loss would go to the Universal Credit Company, and that he had never offered to return the money so paid by the appellant, nor had he asked the Universal Credit Company to return it to the appellant. It is likewise true that after the answer was filed setting up the appraisal and award, and the payment to the Universal Credit Company, respondent did not in any pleadings offer to return, or tender the amount so paid.

This action was commenced on or about September 1, 1934, for the recovery of $3,000.00, actual and punitive damages, for fraudulent breach of the policy contract, issued by the appellant, covering the said motor truck. After pleading a general denial, the appellant set up the arbitration and award hereinabove referred to, alleged that such award had been made in a fair, impartial, and proper manner, and that the appellant had not practiced any fraud on the respondent nor breached its contract in any manner; that having paid the amount of the award to the Universal Credit Com-

pany, appellant had fully discharged its liability under the contract.

During the course of the trial the appellant made a motion for a nonsuit, for a directed verdict, and for a new trial, all of which were overruled by the trial Judge. The trial resulted in a verdict for the plaintiff for $318.00 actual damages, and $750.00 punitive damages. Under order of the Court, the verdict for actual damages was reduced by $50.00, leaving the amount of the judgment for actual damages at the sum of $268.00. The sum of $50.00 was remitted on the record.

The appeal of the appellant to this Court is based upon five exceptions, from which it formulates three questions. We shall consider them in the order made:

> I. Is plaintiff precluded from recovery in this action for failure to return, or tender, the amount paid in settlement of the fire loss?

Otherwise stated, did the payment to the Universal Credit Company by the appellant of the sum of $282.00, the amount of the award, have the same effect as if this sum had been paid directly to the assured, and is his failure to return, or tender, such payment a bar to this action?

It may be conceded, under the decisions of this Court, that if this money had been paid directly to the respondent and accepted by him, a nonsuit or directed verdict should have been granted because of his failure to return, or tender, the said sum. *Lawrence v. Durham Life Ins. Co.*, 166 S. C., 203, 164 S. E., 632; *Cook v. Hartford Fire Insurance Co.*, 168 S. C., 283, 167 S. E., 148.

The appellant takes the position that if in the instant case it had paid the amount of the award to the respondent, then the Universal Credit Company could have recovered the amount so paid by the insurer to him. Therefore it would logically follow that the amount of the award in this case belonged to the Universal Credit Company, and that the insurer was obligated to pay the same to it, which it did;

such payment was, therefore, in legal effect payment to the respondent; and that before he can sue for the fraudulent breach of the policy contract under which the payment was made, he must either refund or tender the amount so paid.

The appellant directs our attention to the general rule announced in *Riggs v. Home Mutual Fire Protection Association,* 61 S. C., 448, 39 S. E., 614, 617, where it is said: "It is generally affirmed, as a rule, that fraud avoids all contracts; but it would be more correct to say fraud makes all contracts voidable, for it is at the option of the party to be affected by the fraud whether or not he will treat the contract as void and rescind it. The right to rescind, however, is subject to this restriction: that if, after the discovery of the fraud, one party still avails himself of the benefit of the contract, or permits the other to proceed with the execution of it, he will thereby be held to have waived the tort and affirmed the contract."

The specific question before us is: Will this well-recognized rule be extended to cover a case where the money was paid to a third person, who credited plaintiff's account with it, in accordance with an award alleged to have been fraudulently obtained by the person paying it; such money having been paid without the knowledge of the plaintiff, and concerning which payment he knew nothing until after his action had been commenced? We think the facts and circumstances of this case make the exception to the rule.

In the case at bar the respondent gave the appellant notice that he was not satisfied with the award, and would not accept the money in settlement of his claim. If the general rule of tender invoked by the appellant should be held to be applicable to cases such as this, it would in many instances leave parties similarly situated with no remedy at law. In the case at bar it involves the refusal of the third party (Universal Credit Company) to pay over to the plaintiff the money it received, for the purpose of enabling him to make the tender. It is conceivable that there might be in some cases collusion between the mortgagee and the insurer

which would render it impossible for the plaintiff to obtain the return of the money for the purpose of making the tender. However, in this case there is no evidence of collusion. To adopt such a rule, the plaintiff would be required to return or tender something that he personally has not received as a condition precedent to bringing his action, and would necessitate his obtaining the necessary money, either from funds of his own, or funds from some other source, all of which might be entirely impossible.

The appellant knew that the respondent had refused to accept the award, and that he had repudiated it. Following the award the appellant sent him the loss and damage agreement to sign, showing his concurrence in the award. This he refused to sign.

In the case of *Simpson v. Doggett,* 159 S. C., 294, 156 S. E., 771, 773, the Court had under consideration the case of a minor, who was seeking to have a judgment reopened, on the ground that her guardian *ad litem* had not properly represented her. The case had been tried by consent, and the judgment rendered therein was given to cover medical and hospital expenses which had actually been paid following the judgment. The defense was interposed that the relief sought should not be granted because the plaintiff had not returned, or tendered, the amounts paid under the judgment for the medical and hospital expenses.

In disposing of this question, the Court recognized the usual rule as to tender, laid down in the cases of *Levister v. Railroad Co.,* 56 S. C., 508, 35 S. E., 207; *Riggs v. Home Mut. Fire Protection Association,* 61 S. C., 448, 39 S. E., 614, and stated that this rule did not apply in the *Simpson case,* since the appellant was a minor. Another reason given why it did not apply was that: "As a matter of fact, also, the appellant received nothing to tender back; no part of the money paid out by the insurance company on the judgment went to the appellant, it being paid to others altogether."

This holding is a clear restriction of the usual rule, and holds, in effect, that a return or tender is necessary only when the amount has been paid to and personally received by the party against whom the rule is invoked, although it might have been paid for his benefit. This decision is in line with the general law on this question.

In 53 C. J., p., 1237, par. 54, it is said: No tender is required "Where the entire consideration moved to a third person, the releasor having nothing in his hands or under his control to return, the rule requiring restoration or tender does not apply." Citing *Alabama Co. v. Brown,* 207 Ala., 18, 92 So., 490; *Averill v. Wood,* 78 Mich., 342, 44 N. W., 381; *Charron v. Northwestern Fuel Co.,* 149 Wis., 240, 134 N. W., 1048, 49 L. R. A. (N. S.), 162, Ann. Cas., 1913-C, 939.

Upon settled principles of justice, and in line with the authorities herein cited, we think the trial Judge was correct in holding that it was not necessary in this case for the plaintiff to make tender before bringing his action.

II. Was there sufficient evidence of actionable fraud to invalidate, or upset, the award arrived at in accordance with the policy provisions and appraisal agreement?

We think there was sufficient evidence of actionable fraud in this case to set aside the award, such question being properly submitted to the jury by the trial Judge. It appears from the evidence that after the two appraisers had viewed the burned truck of the plaintiff, they went to a building in the Town of Bishopville to confer and make an appraisal of the damage. While they were within the building, the adjuster representing the appellant, and the umpire, tarried on the outside. The adjuster testified that he and the umpire, after taking the plaintiff to the mill where he worked (the two appraisers, the umpire, the adjuster, and the plaintiff having just viewed the truck together), "returned to wait around until the two appraisers notified me that they could not quite get together, they needed the umpire." At another point, on

cross examination, he testified, "I came over to see that the appraisal was made in accordance with the contract, because they were inexperienced appraisers"; although Mr. W. J. Shaw, the appraiser selected by the appellant, testified that he had acted as appraiser in such dispute on several prior occasions.

Mr. Inabinett, the appraiser appointed by the plaintiff, testified that when he and the appraiser, Mr. W. J. Shaw, designated by the defendant, could not agree, they "called for the umpire (who was standing in front of the building with Mr. Phelps, the adjuster) and Mr. Phelps and the umpire came back"; and Mr. Phelps, representing the defendant insurance company, had in his hand an estimate of the damage done to the truck by the fire, made by an automobile mechanic (Tom Evans), from which he would call the figures, and that Phelps was doing most of the talking., "and was trying to show us what Tom Evens had said, and he knew whatever Tom Evens estimated would be all right, he knew all about it."

In his testimony Mr. Phelps stated, on direct examination, in reply to the question, "Did you or not make any effort to influence the umpire and appraisers in reaching their decision": "I made that much effort, I presented my testimony."

The evidence is uncontradicted that while all of this was going on, the plaintiff was miles away at his work. He testified that when all of the parties left the place where the damaged truck had been viewed and inspected, Mr. Phelps offered to take him in his automobile back to the mill where he worked, with the statement that he (Phelps) "would carry me back to the mill, he was not going to interfere with them" (appraisers and umpire); and the plaintiff further testified that he would not have left the appraisers if Mr. Phelps had not told him that he would not interfere with them.

In 2 R. C. L., 391, par., 35, we find the following: "It has

been held that where a party takes a fraudulent advantage of the other party, the award will be set aside."

And it has been held—and properly so—that the ■ award will be invalidated, without inquiring as to whether the conduct or act in question actually produced any harmful results to the complaining party, if the conduct of such party had a tendency to affect improperly the decision of the arbitrator or arbitrators in the matter in issue. 5 C. J., 188, par. 479.

We quote from *Wilkins v. Van Winkle*, 78 Ga., 557, 3 S. E., 761, 763: "It appears from the evidence—the evidence of Mr. Wilkins himself—that he had improper intercourse with the arbitrators after the case was closed, and after Mr. Van Winkle, the other party, had gone away. He had this intercourse without the knowledge, and out of the presence, of the other party. One of his acts was to put before the arbitrators a newspaper which contained some quotations of prices,—a subject upon which a part of the controversy turned. He disclaims all improper intention in doing this, and says, in his testimony, that he considered the newspaper against him. * * * It was not produced, and we only know from his statement what it contained. We cannot understand why he should have put the newspaper before the arbitrators."

The Court then held that the prevailing party had improper intercourse with the arbitrators, and placed in their hands a paper after the evidence was closed and the arbitrators had secluded themselves for deliberation, and while the other party was absent, and that a judgment of the superior Court setting aside the award would not be disturbed.

In order to invalidate an award it is not even neces-■ sary to show that the alleged partiality shown was corrupt. In the case of *Shinnie & Loomas v. Jonathan Coil*, 1 McCord, Eq., 478, Judge Nott, delivering the opinion of the Court, used this language: "When it is said, that partiality on the part of the arbitrators is a good ground

for setting aside an award, it is not to be understood that it must necessarily be a corrupt partiality. Any *ex parte* proceeding, the effect of which is to give an advantage to one party over the other, is such a partiality as will avoid an award. Suppose the witnesses had been examined *viva voce,* ought not the complainants to have had notice of the time and place of meeting, that they might have heard the evidence. And in principle, there is no difference whether the evidence be *ore tenus,* or in writing. There is no allegation of corruption or° fraud against either the defendant or arbitrators. It is admitted that they are all gentlemen of high respectability, whose characters raise them above any suspicion of that sort. But they have mistaken their duty in hearing evidence on one side without giving the other party an opportunity of being heard. Their award therefore cannot be supported." *Cothran v. Knox,* 13 S. C., 496, 510.

In the case of *Catlett v. Dougherty,* 114 Ill., 568, 2 N. E., 669, 671, the Court held: "Courts will not enter upon an inquiry of how far such conduct may in fact have produced beneficial results, but will, at the instance of the party intended to be thus injured, set aside the award. A party attempting, by overt acts, to corrupt or improperly influence such a tribunal to make an award in his favor is not to be heard to say that he was impotent to accomplish what he sought, and to raise an issue thereupon. *Strong v. Strong,* 9 Cush. [(Mass.), 560], 574; *Cleland v. Hedly,* 5 R. I., 163; *Sisk v. Garey,* 27 Md., 401. See, also, Morse, Arb., 534; 2 Story, Eq., § 1452a."

Mr. Justice Hydrick, in *Fass et al. v. Liverpool, London & Globe Fire Insurance Company,* 105 S. C., 364, 89 S. E., 1040, 1044, very forcefully announced the general principles which should govern an arbitration and award:

"Nor do I concur in the attempt to distinguish between fraud and partiality in arbitrators, because partiality is a fraud upon the rights of the injured party. Each party to an arbitration contracts for and is entitled to a fair and im-

partial decision—one that is not influenced by any improper motive or consideration. Hence, though severally mentioned as good grounds for setting aside an award, fraud and partiality differ more in degree than in nature. If partiality be corrupt, who will say that it is not fraudulent? If the arbitrator be conscious of it, and consciously allowed it to sway his judgment, it is corrupt. The kind of partiality that is not corrupt fades imperceptibly into that which is. There is often no sharp line of demarcation. The distinction is in name and degree. The effect upon the rights of the party injured by it is the same.

"In this connection, it may not be out of place to say that arbitrators often regard themselves as agents, representatives, or advocates of the party by whom they are selected —a notion that is radically wrong. An arbitrator who has a correct conception of the solemnity and dignity of the office and of his duties therein will exercise judicial impartiality, and will not be influenced in the slightest degree in favor of the side appointing him by reason of the fact that he was appointed by that side, or, indeed, by any other improper motive or consideration; but, realizing that, for the time being he is a judge between the parties, he will act as becomes a just and righteous judge."

The same influence or misconduct that would avoid the verdict of a jury ought to avoid an award. *Robinson v. Shanks,* 118 Ind., 125, 20 N. E., 713.

It is impossible to escape the conclusion under all the facts and circumstances and the law applicable thereto, that this award should be set aside. There was sufficient evidence to go to the jury upon the question of actionable fraud.

By so holding, we must not be understood as imputing fraud to the appraisers or the umpire. We do criticize the atmosphere in which the award was made. The appellant's adjuster was overzealous, and the testimony tends to show that he was fraudulently ubiquitous.

III. Was there sufficient evidence of fraudulent intent, accompanied by a fraudulent act, to justify the recovery of punitive damages?

We think there was.

> While it is universally recognized that fraud is never to be presumed nor to be implied, but must be proved, in our opinion there was ample evidence to go to the jury on this question.

The appellant states in his brief that a careful study of the testimony fails to disclose that the respondent had borne the burden of proving fraud imposed upon him by law, and that he has not shown by the preponderance of the evidence that the defendant's adjuster has been guilty of such fraudulent acts as would justify the infliction of punitive damages. Whether or not the plaintiff has successfully met this burden was a question for the jury. By its verdict, the jury has resolved this question against the appellant.

> What we have related with reference to the testimony in Subdivision II of this opinion concerning the alleged act of the adjuster in taking the plaintiff away from the place where the appraisers were passing upon questions vital to him, and stating to the plaintiff that he (Phelps) would not interfere with them, and thereafter returning and actively joining in their deliberations, applies to the question being passed upon in this subdivision. As stated, we think the Circuit Judge committed no error in submitting to the jury the issue as to punitive damages, and later in refusing to grant a new trial; there being nothing in the record to show that the verdict was the result of bias, prejudice, or caprice on the part of the jury.

It is the judgment of this Court that the judgment of the Circuit Court be, and the same hereby is affirmed.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER, BONHAM and BAKER concur.